George F. Tyler v. Commissioner.
Tyler v. Commissioner
Docket No. 5508.
United States Tax Court
1947 Tax Ct. Memo LEXIS 280; 6 T.C.M. (CCH) 275; T.C.M. (RIA) 47058; March 6, 1947
*280 Sanford D. Beecher, Esq., 1617 Land Title Bldg., Philadelphia 10, Pa., for the petitioner. William D. Harris, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner seeks a redetermination of a deficiency in his income tax for the year 1941 in the amount of $33,426.85. The parties have disposed, by stipulation, of two errors assigned in the petition. The remaining dispute relates to the right of petitioner to take a long-term capital loss in 1941 on the disposition of part of his postage stamp collection. The case was presented by a stipulation of facts and evidence adduced at the hearing. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner resides at Newtown, Pennsylvania, a suburb of Philadelphia. He filed his individual income tax return for the year 1941 with the collector of internal revenue at Philadelphia, Pennsylvania. Petitioner has various interests and receives a large income annually which is derived for the most part from income-producing property. He is in partnership with his wife in the operation of Neshaming Farms, near Newtown. He runs the family estate *281 office at 1231 Land Title Building, Philadelphia, where he manages the family finances and investments; he is a director of the Philadelphia National Bank; chairman of the Board of the Newtown Title and Trust Company; president and member of all the committees of the board of trustees of Abington Memorial Hospital; president and member of the executive committee of the Inter-county Hospitalization Plan, and a member of the executive committee of Westminister College at Princeton. Petitioner visited the family estate offices from one to several days a week. The office is in charge of a bookkeeper, and others are employed to keep records. The Neshaming Farms was operated at a loss from 1936 to 1941. Petitioner has been varying its operations from farm and dairy-herd raising to the present emphasis on raising cattle of registered stock. Petitioner exhibited his cattle at fairs, and frequently won prizes. Petitioner began the collection of postage stamps in 1926. He gave consideration to the matter after conversations with personal friends who were ardent stamp collectors. They were Wharton Sinkler, a brother-in-law, Charlton Henry, now deceased, and William West, also deceased, *282 the father of his daughter's husband. Petitioner was impressed with the investment possibilities in stamps as described to him by his friends. These friends recommended Philip Ward, a professional philatelist, to petitioner. Ward graduated from college in 1909 as an electrical engineer. He had been interested in collecting stamps for a greater part of his life. About 1920 he sold his collection to Sinkler, who then sent him to Europe to purchase stamps. Ward found the stamp business more lucrative and interesting than engineering, and he became and has continued to be a professional philatelist. For the past 25 years Ward has written a weekly column in Mekeel's Weekly Stamp News, the principal philatelic journal. Ward also, for some years, edited and published a house organ known as Ward's Philatelic News, designed as a propaganda publication to increase the interest and knowledge of collectors. Since 1904 Ward has been a member of the American Philatelic Society, the oldest and leading stamp organization in the United States. Ward is a member of the Collector's Club of New York, an organization with limited membership, and he has been employed at various times by the publishers *283 of Scott's Stamp Catalogue. Ward confirmed the advice petitioner had received from his friends that stamps were sound as an investment. He told petitioner of a number of persons to whom he had sold stamps who had disposed of them at a handsome profit. In talking to petitioner, Ward stressed the investment feature of stamps and their history of increasing in value over a period. Petitioner endeavored to check Ward's advice by comparing the then current Scott Catalogue prices with the prices in earlier catalogues, and found that an increase in value seemed to be taking place constantly. The catalogue prices for 1932 are higher than those for 1924. In some actual transactions the catalogue price of stamps is in excess of the sales price therefor. Petitioner's first purchase was a collection of British Colonies stamps for $4,500 on August 15, 1926. Previous to the purchase, petitioner asked Ward's advice as to the later resale value of the stamps, and was advised on July 23, 1926, that next to the United States Postage stamps, those of the British Colonies were the most popular and commanded the greatest attention. Petitioner was also influenced in his decision to purchase stamps *284 by the fact that he had surplus income to invest and did not need theincome from such reinvestments. Petitioner contemplated that the increase in value of the stamps would not be subject to income tax until realized by sale, and in the event of sale the profit would be subject to the lower capital gains tax instead of the high rates applicable to his ordinary income. After his first purchase of stamps in 1926 petitioner continued buying them until May 4, 1940. The total cost of all the stamps purchased by him during this period was $448,037.97. All purchases and sales were handled through Ward and on his recommendation. Petitioner did not purchase all stamps recommended by Ward, as for example when in paying Ward's monthly bill he made "deductions for duplicates which I am returning herewith." But he did not purchase any stamps which Ward did not recommend. Dealers in stamps do not attempt to sell stamps to clients of other dealers, but sell through the dealer who caters to the client. Ward recommended that petitioner invest more in United States stamps than in other categories of stamps because his experience was that stamps hold their value better in the country of issue, and *285 that financial conditions were generally better in the United States. Petitioner acted on this advice and believed that United States stamps were "the blue chips" and had the widest market. In all, petitioner paid $223,249.89 for his United States stamps, exclusive of his United States Inverted Center stamps, as compared with a total of $55,075.16 for British Colonies stamps, and $62,492.97 for World stamps. Petitioner never initiated a request to Ward to purchase or be on the look-out for any particular variety of stamps. Petitioner did not subscribe to any of the philatelic publications nor join any of the various philatelic organizations or, with the single exception of a dinner, attend any of their gatherings, although repeatedly urged to do so by Ward. Ward did not regard petitioner as interested in stamps as a collector or hobbyist. Ward felt that, notwithstanding an effort to do so, he had failed to develop this attitude in petitioner. Petitioner did not exhibit to Ward an enthusiastic collector's interest in or knowledge of stamps, and petitioner was not able to differentiate a rare stamp from a common variety. For these reasons Ward did not recommend the purchase by petitioner *286 of any stamp available at a price he considered over market. He did this in the case of clients who were indulging in a hobby. On April 24, 1929, Ward wrote petitioner asserting that if he was interested in disposing of a certain block of his stamps he could make a profit of $2,500 or 40 percent increase within a year. Petitioner shortly thereafter sold a block of stamps for $6,000, of which according to a letter from Ward "your [petitioner's] total cost per invoices mentioned amounts to $5,345." Petitioner kept his stamps at home so that the albums would be available for the work of inserting them in the proper place. Petitioner acquired between 350,000 and 500,000 stamps which he personally placed in the albums during the evenings and on Sundays. There were 45 or 50 albums. In order to place the stamps properly in the albums, petitioner had to know how to find the stamps in the catalogue and the variations of particular stamps. Ward's practice was to indicate by country and number the place where each stamp belonged in the album. Approximately twice a month Ward went to petitioner's home to aid him in mounting stamps as to which petitioner had difficulty in locating the correct *287 place. The stamps were fully insured against loss by any cause. Petitioner did not often invite people interested in stamps to his home to view or discuss stamps, nor did he visit elsewhere for that purpose. Petitioner could recall two occasions when he showed his stamps to others - on one occasion he showed them to his friend Charlton Henry, and on another to his relative William West. The collecting and possession of petitioner's stamps afford him pleasure. After he decided to sell his stamps petitioner made no purchases except for "new issues" received periodically by means of a regular subscription service at comparatively negligible cost, and this service was eventually discontinued. After petitioner sold his United States and Inverted Center collections, during and prior to the taxable year, he did not remove any of the remaining albums of British Colonies collection and World collection from the shelves of his library for purposes of inspection or any other purpose. These albums were readily accessible. In addition to the United States collection, the Inverted Center collection, the British Colonies collection and the World collection, petitioner, up to May 18, 1927, also *288 collected "U.S. Proofs." On November 4, 1936, the cumulative total for the United States Proof collection was transferred to the cumulative total of the United States collection, and United States Proofs was discontinued as a separate account. Books of account are maintained at petitioner's office in Philadelphia. A principal ledger is kept for all principal accounts, and included among these is an account for all "investments" which is designated as account "B." In connection with his investments, and in addition to account "B," petitioner also maintains a separate book designated "Security Ledger," the purpose and use of which is to record the date of purchase or sale, the cost or sale price, and the identity of all investments. From the time of the first purchase of stamps in August, 1926, petitioner maintained records for his stamp transactions - the purchase and sale of stamps - in exactly the same manner as those he regularly maintained for his other investments. Each stamp transaction was entered in chronological order in the principal ledger in a single investment or "B" account without regard as to whether the particular transaction involved the purchase of stamps for one *289 or more of the four collections mentioned. When a single transaction did involve more than one type of stamp, the total cost of all stamps of each type was segregated and entered separately. The cumulative total cost of all stamps in all four collections was carried in a separate column in this account. Sales were similarly recorded. All stamp transactions from August 1926 to December 31, 1933, were also recorded in the Security Ledger under the designation "Stamp Collection B." The cost and the net selling price of each transaction was entered in this record, a separate entry being made for the four types of stamps. Neither of the foregoing accounts or records showed the cumulative total cost of each of the four collections or types of stamps. In order to show this petitioner kept an additional record. Petitioner set up his books of account for his stamp collection in this manner in order to show separately at all times the cost of each of the four collections. Ward was required to prepare his invoices to show this cost break-down between the four types of stamps. Petitioner maintained the most elaborate records of stamp transactions of which Ward had knowledge. As to a substantial *290 portion of the stamps, it was difficult to maintain a separate cost record of each stamp because the cost of each was not always known at the time of purchase. Petitioner's first purchase is illustrative of this situation. On August 5, 1926, he purchased a collection of British Colonies stamps contained in seven albums. These were sold to petitioner "as a whole for $4,500." Many similar instances occurred where the cost of each stamp was not known, but in all instances the cost of each of the four types of stamps was segregated and entered in the appropriate account for the particular collection. Starting with January 1, 1934, the system of accounting for stamp transactions was changed and simplified. A new separate columnar ledger was opened, designated as the "Stamp Ledger." The balances for each of the four collections, and the aggregate for all were carried forward from the previous system under the opening entries under the same heading, and a new column was added designated "Insurance Value." At the same time, a separate bank account was opened at the Newtown Title and Trust Company, and thereafter all transactions in stamps were handled through that account. The detail of *291 keeping separate bookkeeping accounts for each of the three or four hundred thousand stamps held by petitioner would have been prohibitively expensive. Ward would have been faced with the same practical difficulties on the sales he made of part of petitioner's collection. Petitioner sold no stamps until 1929, when he decided he would sell his United States blocks (a group of four or more stamps, e.g. two above and two below), the cost of which was carried in the account for his United States collection, and also certain Inverted Center stamps, carried in his Inverted Center collection. The Inverted Centers were duplicates and were sold for that reason. He decided to sell the United States blocks and buy no more because as units they were comparatively expensive and not as readily marketable as some others. Ward advised that the stamp market was good at the time, and that the stamps should sell at a profit. At petitioner's request, Ward made up a schedule of estimated current market prices for all of the blocks at $111,247.70. This figure was arrived at on the basis of arbitrary mark-up of the actual cost of the more expensive blocks and the estimated cost of the much larger number *292 of cheaper ones. Some of the more expensive ones he sold in 1929 before the stock market crash, but in 1930, and later, he found he could no longer obtain the prices he had originally placed on the stamps, and in May, 1931, at Ward's suggestion, petitioner authorized the sale of the remaining blocks at lower than the estimated figures. In 1931 petitioner desired to sell his stamps because he needed the money for a new house. A few additional sales occurred in 1932, after which the unsold blocks were returned to petitioner. The total amount received by petitioner for the United States blocks sold was $61,663.13, after deducting all the costs of sale. The aggregate cost of all United States blocks sold was included in the cumulative cost of the United States account, and the net proceeds of sale were credited and deducted from the cumulative total of the United States collection. The duplicate Inverted Center stamps were sold for a net consideration of $6,000. The cost of these was included in the cumulative total cost of the Inverted Center collection, and the net proceeds of sale were credited and deducted from the cumulative total cost of the collection. Petitioner did not report *293 or claim any gain or loss from the sale of these stamps during the years 1929 to 1932, because they were all in his United States account, and he did not think, under his system of bookkeeping, that he could determine properly whether he had sold it at a gain or loss until he had sold all the United States stamps and blocks. In 1936 petitioner considered the sale of his United States collection, and on October 9, 1936, Ward wrote petitioner with reference to his view of the then current market, stating that he was "afraid the profit on the 20th century will not be sufficient to overcome some of the lower prices on the 19th century issues." His letter concluded that if petitioner felt he wanted to sell under present conditions, Ward would assure him of getting as substantial a price as the market would afford. Petitioner decided to sell because in 1936 he began to worry about the situation in Europe, and in 1938, he became convinced that it was only a question of time before there would be another world war. He felt, from his experience in the first world war and thereafter, that he should get his property in as liquid a condition as possible. Because of this he decided to convert *294 from stamps to stocks and bonds. On October 29, 1936, Ward advised that he proposed to sell the United States collection the following April; that his commission would be 10 per cent on gross sales, plus expenses or 17 1/2 per cent of gross sales, whichever was less; that he would have the sales widely advertised; distribute catalogues and exhibit the stamps. On November 6, 1936, petitioner authorized Ward to proceed. Thereafter Ward urged that the sales be deferred because of unfavorable market conditions, and petitioner concurred. By letter dated November 1, 1938, the arrangements relating to commissions for Ward were confirmed and the first of the series of auctions was held in December, 1938. Petitioner had also decided to sell his collection of Inverted Centers. On January 25, 1938, when petitioner was in Concord, Massachusetts, he wrote to his office to have them request Ward to write him as to the progress being made on the auction catalogue of petitioner's United States stamps. They were instructed to impress upon Ward that petitioner wanted to sell the collection in the spring "if the predicted boom materializes." They were also advised to instruct Ward that when the *295 United States catalogue was completed, petitioner wanted him to begin preparing a catalogue for the Inverted Center collection, "with the thought of selling that as soon as practical after the U.S. sale." On January 26, 1938, Ward replied to petitioner, stating that the sale could be arranged for April or May, but that on the basis of general conditions he would prefer to wait a little longer; that on inquiries made by Ward, and from his experience and on the basis of Babson predictions, he thought that there would be "much better times" in the near future. There were seven public auctions of petitioner's stamps, and many stamps were sold by private sale. The auctions were held December 6, 1938, August 21, 1939, October 18, 1939, November 29, 1940, January 16, 1941, April 2, 1941, and June 11, 1941. The last private sale occurred in 1941. The stamps were catalogued and sold in groups of varying numbers, and in some cases in different groupings than in which purchased. Petitioner knew that the market condition was bad when he made these sales but he was desirous of getting himself into a liquid condition. The decision to sell was entirely his, and contrary to Ward's advice. *296 For the same reason he discontinued buying stamps. He had desired to sell his British Colonies and World collections but the unfavorable results of the United States and Inverted Center sales caused him to change his mind. Petitioner still owns his World collection and British Colonies collections. Petitioner at first would not permit his name to be associated with the sales, but later, on further urging by Ward, did permit its use. On December 15, 1938, petitioner wrote Ward that he did not intend to buy any more stamps until he had satisfactorily liquidated his United States and Inverted Center collections. He excepted the monthly new issues which he stated he wished to continue. On September 11, 1939, petitioner wrote Ward to cancel as quickly as he could petitioner's subscription to monthly new issues of stamps because "In view of the world situation I feel I should get my money out of stamps when I can and put no more in." On June 3, 1940, petitioner wrote Ward: It is obvious that even a super-salesman like yourself can do nothing with stamps during the present situation throughout the world. I suggest, therefore, that you might as well turn back to me my books of Inverted *297 Centers, of which I believe you have only sold two, and the odd lots of United States stamps which you are still holding for me. With them in my possession I can at least have the pleasure of looking at them and playing with them. At your convenience, therefore, will you deliver these to my office and I will take them home. I count on you, when and if the stamp market revives and there is a prospect of selling at reasonable prices, to let me know, but I imagine that will not be for quite a long while. Petitioner reconsidered, however, and proceeded with the sales as originally planned, the next public sale being the one held in November, 1940. The aggregate cost of the United States collection and the Inverted Center collection, which were sold, was $268,781.71, and the net proceeds after deducting the costs of sales was $58,005.37, resulting in a loss of $210,776.34. The stamp market in May of 1946 was high. The stamp market generally follows the security market or similar markets. Large amounts of money are used to buy stamps today. The philatelic agency conducted by the Federal Government does a business of about $3,000,000 a year. It was started by President Harding with *298 about $5,000 appropriated to it. It now has about 60 clerks and contemplates expansion. Petitioner reinvested the proceeds of his stamp sales in marketable securities, including Philco and Warner Swasey stock, at an aggregate cost of $39,611.88. This was about September 24, 1940. On about October 6, 1941, petitioner used approximately $20,000 from his stamp account to pay for the purchase of Dow Chemical Company stock. During the years 1926, to 1940, inclusive, when all of petitioner's stamps were purchased, petitioner invested $7,926,533.76 in securities and received $7,561,037.94 from the sale of securities. Petitioner's primary intent in purchasing the stamps in question was for investment purposes. Any loss sustained by petitioner during the taxable year is a loss arising out of a transaction entered into for profit. Opinion If petitioner's loss, through the sale of a part of his stamp collection, was sustained in a transaction entered into for profit, it is deductible. [1] The statutory language envisages a test related to the purpose for which the taxpayer engaged in the transaction, and requires us to attempt to capture that somewhat elusive factor constituting state *299 of mind, or intent. See ; . While, in order to justify the deduction, the object of the undertaking must have been the realization of pecuniary gain, that purpose need not be exclusive. It is sufficient if the profit aim is "the prime thing." See ; It is easy to conclude that petitioner was interested in securing some financial benefit from his postage stamp collection. If that could be isolated as petitioner's sole purpose, it would undoubtedly also satisfy the requirement of primacy. But that is a conclusion we are unable to reach *300 on this record. Too many factors, including contemporary statements by petitioner himself, require the coordinate finding that he derived personal pleasure and satisfaction from the ownership, possession, and handling of the collection. The difficulty, then reduces itself to the task of ascertaining whether petitioner has sustained his burden of proving that the desire to make a financial profit was the most important motive which led him to acquire the components of his collections. The unequivocal testimony of petitioner himself was to the effect that the prospects of financial reward were not only the prime, but the single element in the state of mind with which he approached the subject. While, as we have said, other phases of the record are not consistent with the conclusion that profit was petitioner's only purpose, they do not of themselves climinate the possibility that it was the prime consideration. Since we are unwilling to discount entirely petitioner's solemn assurances under oath, we have found as a fact that the "requisite greed" was petitioner's principal motivation, and accordingly, the enterprise partakes of the necessary characteristic of being entered into for *301 profit. The closing of the transaction by the sale of the stamps, however, did not all take place in the instant tax year. We cannot sustain the contention that it required the complete disposition of an entire collection before any part of the loss could be considered as sustained for deduction purposes. "It is now well settled that where property is acquired as a whole for a lump sum and subsequently disposed of, a portion at a time, there must be an allocation of the cost or other basis over the several units (except where apportionment would be wholly impracticable) and gain or loss computed and reported upon the disposition of each part." . See also . And we are wholly unsatisfied that apportionment would be impracticable. Although the parties have not discussed the necessary allocation of basis, it was arranged at the hearing that upon the foregoing disposition of the proceeding "petitioner is to have leave to apply, upon the handing-down of that opinion, for further time within which to file a supplementary brief dealing with the question * * * of *302 what is the basis * * * and * * * the respondent will have an opportunity to reply to that brief." To permit the disposition of stipulated adjustments, and unless on or before April 1, 1947, the parties otherwise move in conformance with the foregoing arrangement. Decision will be entered under Rule 50. Footnotes
1. INTERNAL REVENUE COED SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or * * *↩